767 THIRD AVENUE ASSOCIATES, Carlyle Limited Partnership–XI, Melvyn Kaufman, & Robert Kaufman, Plaintiffs,

v.

CONSULATE GENERAL OF THE SOCIALIST FEDERAL REPUBLIC OF YUGOSLAVIA, Yugoslav Press & Cultural Center, Yugoslav Chamber of Economy, Federal Republic of Yugoslavia, Republic of Bosnia–Hercegovina, Republic of Croatia, Republic of Macedonia, & Republic of Slovenia, Defendants.

Federal Republic of Yugoslavia, Cross–Claim Plaintiff,

v.

Republic of Bosnia–Hercegovina, Republic of Croatia, Republic of Macedonia, & Republic of Slovenia, Cross–Claim Defendants.

No. 96 Civ. 1363(CBM).

United States District Court, S.D. New York.

Aug. 17, 1999.

Mayer, Brown & Platt, by Robert J. Ward; Jean–Marie L. Atamian; Valerie–Leila Jaber, for plaintiffs.

Hamburger, Weinschenk, Molnar & Fisher, by John C. Fisher; Mark S. Hamburgh, for Federal Republic of Yugoslavia.

Feith & Zell, P.C., by George Miron; Douglas J. Feith, McGarry & Simon, by James McGarry, for Republic of Bosnia–Hercegovina.

Pavelić & Levites, P.C., by Richard Cashman; Barbara Novosel, for Republic of Croatia.

Patton Boggs, L.L.P., by Steven Schneebaum; Michael J. Nardotti, Jr.; Joe R. Reeder, for former Yugoslav Republic of Macedonia.

Cleary, Gottlieb, Steen & Hamilton, by Boaz S. Morag; Jonathan I. Blackman; Lisa M. Schweitzer, for Republic of Slovenia.

Mary Jo White, United States Attorney for the Southern District of New York by Wendy H. Schwartz, Assistant United States Attorney, for United States of America.

## OPINION

MOTLEY, District Judge.

The Socialist Federal Republic of Yugoslavia ("SFRY") leased property from plaintiffs for diplomatic offices in the City of New York. As the SFRY government fell, the United States forced it out of those offices, and the SFRY stopped paying plaintiffs rent. Plaintiffs filed this action against the SFRY and five new states that have emerged from the territory of the SFRY. The five new states moved for summary judgment and to dismiss.

For the reasons given below, the court holds that this action currently presents non-justiciable political questions. Accordingly, the court stays all matters in the case and places the case on the suspense calendar.

## I. Background

### A. History of Yugoslav Leasing of Plaintiffs' Properties

Plaintiffs are the owners of the property at 767 Third Avenue in the City of New York. Compl. ¶ 5.[1] During February–March 1981, the SFRY entered into three leases with plaintiff 767 Third Avenue Associates ("767") through 767's agent Sage Realty Corporation ("Sage"). The leases were for long-term tenancies for three SFRY governmental agencies (collectively, "SFRY tenants"): the Consulate General of the SFRY ("Consulate"), the Yugoslav Press and Cultural Center ("Center"), and the Yugoslav Chamber of Economy ("Chamber"). Ridulfo Aff. ¶¶ 2, 19, 38. The three leases all expired in late August 1991. *Id.* In 1991, as the 1981 leases ended, Sage and the SFRY tenants extended them for several more years. On August 5, 1991, the Chamber lease was extended to August 31, 1996; on October 21, 1991, the Center lease was extended to September 30, 1994; on October 28, 1991, the Consulate lease was extended to August 31, 1996. *Id.* ¶¶ 4, 22, 40. The SFRY breached these lease extensions, plaintiffs allege, by failing to pay the SFRY tenants' rent since May 1992 (for the Chamber) and June 1992 (for the Consulate and the Center). Compl. ¶¶ 24–25, 35–36, 46–47. Plaintiffs claim that the total SFRY debt is

---

1. Unless otherwise noted, "Compl." refers to plaintiffs' Second Amended Complaint.

$2,262,224.41 plus interest. Compl. ¶¶ 27, 39, 50.

### B. Disintegration of the Socialist Yugoslav Regime .

Political upheaval in the SFRY was the spark for the SFRY tenants' rent delinquencies. Beginning in 1991, the SFRY government began to dissolve and the SFRY degenerated into civil war. Expressing its opposition to the conduct of the dominant Yugoslav regime in Belgrade, the United States government forced the SFRY tenants' offices in New York to close. On May 25, 1992, the United States Department of State ordered that the SFRY tenants (and other SFRY consulate staff in the United States) close their offices immediately, terminate operations by May 31, 1992, and have all staff leave the United States by June 7, 1992. Fed. Republic of Yugoslavia R. 56.1 Stmt. ¶ 32 & Pls.' Resp. ¶ 32; Ward Aff. ¶ 14. Additionally, Yugoslav assets in the United States were blocked by presidential executive orders dated May 30, 1992 and June 5, 1992 and related Treasury Department regulations. Fed. Republic of Yugoslavia R. 56.1 Stmt. ¶¶ 33–35 & Pls.' Resp. ¶¶ 33–35; Ward Aff. ¶¶ 15–17.

### C. Plaintiffs' Prior Efforts at Legal Redress

On June 12, 1992, plaintiff 767 and Sage filed a Court of Federal Claims action against the United States, alleging that the government had taken their private property for public use and claiming a Fifth Amendment right to just compensation. Ward Aff. ¶ 2. On December 21, 1993, the Court of Claims dismissed the complaint; the Court of Appeals for the Federal Circuit affirmed the dismissal. *767 Third Avenue Assocs. v. United States*, 30 Fed. Cl. 216 (Fed.Cl.1993), *aff'd*, 48 F.3d 1575 (Fed.Cir.1995).

On July 2, 1992, plaintiff 767 filed an action against the three SFRY tenants for unpaid May–July 1992 rent, *767 Third Avenue Assocs. v. Consulate Gen'l of the SFRY, Yugoslav Press & Cultural Ctr., & Yugoslav Chamber of Economy*, No. 92 Civ. 4946(MBM). Ward Aff. ¶ 3, Ex. A. As against the Chamber, a default judgment was entered on December 17, 1992; the Chamber has not paid the $8,802 judgment. *Id.* ¶¶ 6–8. As against the Consulate and the Center, the case settled and the action closed on December 22, 1992; while the Center made the required $63,765.01 payment, the Consulate has not made its payments under the settlement. *Id.* ¶¶ 9–11.

### D. The Present Action

On February 23, 1996, plaintiffs filed the present action for the entire amount of the SFRY tenants' rent delinquencies under all the 1991 lease extensions. The defendants are the SFRY tenants as well as the five new states that emerged from the territory of the SFRY (collectively, "state defendants"): the Federal Republic of Yugoslavia ("FRY"), the Republic of Bosnia–Hercegovina ("Bosnia"), the Republic of Croatia ("Croatia"), the Former Yugoslav Republic of Macedonia ("Macedonia"), and the Republic of Slovenia ("Slovenia"). Plaintiffs allege that the five state defendants are successors to the SFRY's liabilities as sovereign states that formerly were part of, and that together constitute the whole of, the SFRY. Compl. ¶¶ 8, 27, 39, 50. Defendant FRY has filed a cross-claim against the other state defendants.

The five state defendants all have filed essentially similar, but somewhat divergent, dispositive motions. The FRY has moved for summary judgment pursuant to Fed.R.Civ.P. 56. Macedonia has moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. Bosnia, Croatia, and Slovenia have moved to dismiss pursuant to both Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Macedonia, Bosnia, and Slovenia also have moved to dismiss the FRY cross-claim.

In a written submission and at oral argument, the United States has stated its policy regarding the status of the SFRY and the status of each of the five state defendants. *See* United States Stmt. of Interest ("U.S.Mem."); Tr. at 66–72. Succession issues aside, the United States has not recognized the FRY as a sovereign state, but has ˙recognized the other four non-SFRY nations. Tr. at 69–70. The United States position on succession is as follows:

> It is the fundamental position of the United States at this point that the Socialist Federal Republic of Yugoslavia, the SFRY, has ceased to exist and that no state represents its continuation.... [E]ach of the states that is before your Honor today that has emerged on its territory, on the territory of the former SFRY, is a successor. Each has interests in the assets and liabilities of the former SFRY, but those interests have not yet been determined by the executive.

Tr. at 66–67; *see also* U.S. Mem. at 3–4. The executive branch has not reached a final determination on these succession issues because, it explains, "the question of how assets and liabilities located in the United States should then be allocated to the various successors ... must be determined by international negotiation, and that international negotiation has not yet concluded." Tr. at 70. "The present policy of the United States is to encourage the successors to the SFRY to reach an internationally negotiated settlement of these issues. Until those negotiations succeed, or until allocation of assets and liabilities is settled politically in some other way, claims raising these issues are unsuitable for judicial resolution." U.S. Mem. at 9–10. As against the state defendants, the United States concludes that this case is non-justiciable because "the manner in which assets and liabilities of a former state are to be allocated amongst one or more successors is not a question for the courts to decide, but is a political question that is reserved to the Executive Branch."

Tr. at 67; *see also* U.S. Mem. at 9. As against the SFRY tenants, the United States does not object to continuation of this case, U.S. Mem. at 10–12, but reiterates that no judgment now could be enforced against the state defendants. Tr. at 70–71.

## II. Discussion

### A. Non–Justiciable Political Questions

During the SFRY's transition to a number of sovereign states, this judicial district has seen several cases of disputed claims to SFRY assets and liabilities (collectively, "SFRY asset/liability cases"). *See Sage Realty Corp. v. Jugobanka, D.D.*, No. 95 Civ. 0323(RJW), 1998 WL 702272 (S.D.N.Y. Oct.8, 1998) (landlord's claim for unpaid rent against tenant Yugoslav bank expelled from United States); *Beogradska Banka A.D. Belgrade v. Interenergo, Inc.* ("*Beogradska Banka*"), No. 97 Civ. 2065(JGK), 1998 WL 661481 (S.D.N.Y. Sept.24, 1998) (FRY bank's claim of succession to SFRY bank and loans it held); *Jugobank A.D. Belgrade v. Sidex Int'l Furniture Corp.* ("*Jugobank*"), 2 F.Supp.2d 407 (S.D.N.Y.1998) (FRY bank's claim of succession to SFRY bank and debt obligations it held); *Yucyco, Ltd. v. Republic of Slovenia*, 984 F.Supp. 209 (S.D.N.Y.1997) (creditor's claim against Slovenia on SFRY contracts); *Yucyco, Ltd. v. Republic of Croatia*, No. 96 Civ. 5559(DC), 1997 WL 728173 (S.D.N.Y. Nov.19, 1997) (companion case to *id.,* holding same as against Croatia); *Fed. Republic of Yugoslavia v. Park–71st Corp.* ("*Park–71st*"), 913 F.Supp. 191 (S.D.N.Y. 1995) (FRY's claim to SFRY-owned New York apartment).

Despite the political upheaval underlying the SFRY asset/liability cases, not all have featured non-justiciable political questions. "[P]olitical question doctrine must be cautiously invoked, and the law is clear that the fact that a case touches on foreign affairs does not, without more, imply that the case involves a politi-

cal question." *Can v. United States,* 14 F.3d 160, 163 (2d Cir.1994); *see also Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir.1995) ("Although ... cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions."). Cases pose non-justiciable political questions only to the extent that they pose "questions ... beyond the competence and proper institutional role of the federal courts." *Jugobank,* 2 F.Supp.2d at 415. Factors that are "[p]rominent on the surface of any case held to involve a political question" include the following six:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), *quoted in Kadic,* 70 F.3d at 249, *and Can,* 14 F.3d at 163. All of the above six factors would be present in a judicial allocation of SFRY liabilities among the five state defendants in this action.

1. Judiciary Limitations: Successorship & Allocations Among Successors

Limitations on judicial competence and role are the bases of the second and third factors: "a lack of judicially discoverable and manageable standards for resolving" the claims and "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion," respectively. Succession determinations are inherently political, destined to be decided in negotiation, international institutions, arbitration, war, etc. In dismissing claims of successorship to the assets of the defunct South Vietnamese regime, *Can* established that successorship is the classic sort of political question that courts cannot decide:

[C]ourts have no standards for judging a claim of succession to a former sovereign, even where that succession is only to property rather than to government power. The recognition of any rights of succession to a foreign sovereign's power or property is in the first instance constitutionally committed to the executive branch of government, not to the judiciary.

14 F.3d at 163.

In each of the SFRY asset/liability cases, a critical factor in the court's political question analysis has been whether resolution of the case necessarily required judicial resolution of politically disputed successorship questions. Courts have been willing to adjudicate SFRY cases that could progress without adjudication of such questions. Because *Sage Realty* featured no successorship arguments at all, it remained nothing more than a basic action for unpaid rent, and the court awarded summary judgment to the plaintiff landlord of the tenant Yugoslav bank expelled from United States. 1998 WL 702272. *Beogradska Banka* found various issues to be non-justiciable political questions but denied summary judgment because, with factual uncertainty regarding whether the disputed assets ever actually were SFRY assets, the case might not require the court to address the political questions. 1998 WL 661481, at *8, *10.

Each of the other SFRY asset/liability cases was dismissed as presenting nonjusticiable political questions because each would have required the court to determine the extent of at least one of the new states' successorship rights or responsibilities. *See Jugobank,* 2 F.Supp.2d at 415–17

(granting motions to dismiss, as non-justiciable political questions, claims to debt obligations based on plaintiff FRY bank's alleged succession to SFRY bank's assets); *Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. at 217 (granting motions to dismiss, as non-justiciable political questions, claims by plaintiff creditor against Slovenia on SFRY contracts); *Yucyco, Ltd. v. Republic of Croatia,* 1997 WL 728173, at *1 (companion case to *id.,* holding same as against Croatia); *Park–71st,* 913 F.Supp. at 193–95 (dismissing, as non-justiciable political question, claim by plaintiff FRY to SFRY-owned apartment).

*Yucyco,* in many ways the most factually on-point of the SFRY asset/liability cases, held that even though "Slovenia clearly constitutes a successor state" to the SFRY, 984 F.Supp. at 217, the court could not adjudicate claims against Slovenia as an SFRY successor because of the political questions entailed in apportioning liability among all the SFRY successors:

> While the international norm may arguably be that a successor state should be held liable for a share of its predecessor's liabilities, plaintiff has not offered any basis by which this Court may 'equitably' apportion Slovenia's liability, if any.... [R]esolution of [plaintiffs'] claims would require this Court to make policy determinations—including, for example, apportionment of responsibility among the five new republics—for which the Court is ill-suited and "of a kind clearly for nonjudicial discretion."

984 F.Supp. at 219 (quoting *Baker,* 369 U.S. at 217, 82 S.Ct. at 710). Other courts in this district have concurred that even where defendants' successorship to the SFRY is established, allocation of SFRY assets and liabilities among multiple successors remains entirely unclear, and a judicial finding of liability based on the successors' SFRY inheritances therefore would present non-justiciable political questions. *Beogradska Banka,* after noting that "judges in this District have held that claims by the FRY[ ] and other suc-

cessor states to assets of the former SFRY present nonjusticiable political questions," 1998 WL 661481, at *6, rejected the suggestion that court could "determine whether a plaintiff can recover assets from a defendant but only on the condition that the plaintiff cannot be awarded the assets because such an award would involve a political question," *id.* at *9. *See also Jugobank,* 2 F.Supp.2d at 416 ("[U]ltimate allocation of assets and liabilities of the former SFRY among the successor states is a political question." (citation omitted)). These precedents illustrate that this court cannot avoid the political questions of SFRY successorship by adjudicating liability but staying any efforts to allocate that liability among the state defendants, as plaintiffs suggested, *see* Pls.' Dec. 29, 1998 Letter Brief.

Moreover, the political questions that this case presents, and that international processes are better suited to determine, include not only each successor's *percentage* of SFRY liabilities, but also each successor's *date* of successorship to the liabilities now at issue. The three 1991 lease extensions commenced during the same year as Yugoslav civil war, SFRY dissolution, and various SFRY successors' declarations of independence. Given the rancor and hostilities surrounding the SFRY dissolution process, it is far from clear that each of the state defendants actually enjoyed use of the SFRY diplomatic premises in New York right up until its formal date of independence; conversely, it may not be clear that each nation ceased availing itself of all SFRY privileges on any particular date of independence. Consequently, any one date, even one the United States officially recognizes as a date of independence, may not be the exact date on which an SFRY successor's responsibility for SFRY lease liabilities terminated. Croatia, for example, argues that by the time the 1991 lease extensions all took effect, "fighting already had occurred and Croatia already had declared its independence of the SFRY," and "the premises in

question were never made available to Croatia or the other successors" than the FRY. Croatia Mem.Supp.Mot. Dismiss at 8 n. 4, 9. The FRY counters that Croatia, after declaring independence, continued to negotiate "a continuation of the former Yugoslavia except in ... a looser structure." Tr. at 64. These questions regarding dates of successorship would thrust political questions directly into the liability phase of adjudication.

Similarly, this court cannot adopt the United States proposal to define the political questions more narrowly, with only the five state defendants dismissed and with the case allowed to proceed as against the SFRY tenant defendants. U.S. Mem. at 10–12. The United States position is informative, especially as to existing United States foreign policy, but not binding, especially as to legal doctrine, because:

> justiciability goes to the constitutional and prudential limits of the judicial power. While the views of the executive branch often will have an important bearing on a court's determination, especially where the concern is possible conflict with a coordinate branch of government, they are not conclusive.... As Justice Brennan wrote, "[t]he Executive Branch ... cannot by simple stipulation change a political question into a cognizable claim."

*Jugobank,* 2 F.Supp.2d at 416 (S.D.N.Y. 1998) (quoting *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 788–89, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (Brennan, J., dissenting), and noting that "[t]his aspect of Justice Brennan's dissent ... commanded a majority of the Court"). Conversely, "even an assertion of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication." *Kadic,* 70 F.3d at 250. Even if the executive branch could waive prudential separation of powers concerns, it cannot waive constitutionally-based limits on judicial role. Executive branch acquiescence does not dispel many rationales for non-justiciability, such as the threat of judicial inconsistency, judicial overreaching past its prudent and constitutional role, and the lack of judicial competence to decide such political matters under manageable legal standards.

Protection of the United States' asserted interest in avoiding judicial allocations among SFRY successors requires that this court avoid adjudicating liability at all. While this view may be contrary to the executive branch's legal conclusion, it is consistent with the executive branch's political conclusion. To the extent that the state defendants succeeded to SFRY assets and liabilities, it would be problematic for this court to forbid them from participating in an action creating SFRY liabilities that they would inherit. As the FRY asked, "who would defend the action[,] ... conduct the discovery[,] ... conduct the defense[,] ... [or] pay for the defense? Suppose one state is delegated to do it. What if another state disagrees with the strategy ..., could it then disavow the debt?" Tr. at 62. Management of the state defendants' participation in proceedings against the SFRY defendants would present practical and political problems of the same nature as proceedings allocating SFRY assets and liabilities among the state defendants.

### 2. Separation of Powers: Executive Branch Foreign Policy Authority

Separation of powers concerns are at the heart of the first and fourth factors: "a textually demonstrable constitutional commitment of the issue to a coordinate political department" and "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government," respectively. As *Can* noted, there is a textual constitutional commitment of the issues to the executive branch, such as by Sections 2 and 3 of Article II of the United States Constitution, which grant the executive branch authority regarding recogni-

tion of foreign governments. 14 F.3d at 163. *Can* rejected as "without effect" an asserted distinction between "recognition as a sovereign ... [or] simply as successor in interest to the property of their former government" because "any resolution of title in [one successor's] favor would prejudice other claimants, including any government the President might choose to recognize as sovereign successor." *Id.* In *Can,* as here, "competing claims to the assets in question exist.... The existence of competing claims demonstrates that adjudication ... is intertwined with sovereign recognition." *Id.*

While the United States has accepted that all five nations are SFRY successors, it has refused to recognize the FRY as a sovereign state and has insisted that unfinished international negotiation efforts be the basis for United States policy regarding proper allocation of SFRY assets and liabilities. Tr. at 66–67, 70–71; United States Mem. If this court made an allocation decision, the executive branch, which should set national foreign policy, would be adhering to one allocation process (international efforts) while the judicial branch, which generally should avoid setting foreign policy, would be adhering to its own allocation process. *See* U.S. Mem. at 9 ("The present policy of the United States is to encourage the successors to the SFRY to reach an internationally negotiated settlement of these issues."). It would violate separation of powers principles for this court to create a situation so inconsistent with, and potentially detrimental to, United States foreign policy positions and efforts.

### 3. Risk of United States Government Inconsistency: Splits in Judicial Authority

The risk of inconsistency among United States governmental bodies is the problem addressed in the fifth and sixth factors: "an unusual need for unquestioning adherence to a political decision already made" and "the potentiality of embarrassment from multifarious pronouncements by various departments on one question," respectively. Part of the concern here is conflict between the executive and judicial branches, which, as discussed above, is not only a problem of conflict between two co-equal branches, but a problem of encroachment by a judicial branch that particularly should avoid interfering with foreign policy questions.

Another part of the concern here, however, is conflict among the courts. All courts in this district addressing the issue have held that allocation of assets and liabilities among SFRY successors is a non-justiciable political question. *See supra* Part II.A.1. A contrary holding by this court would be an anomaly creating a split of judicial authority: district courts in the same district would be instructing the same SFRY successors that they have no right to SFRY assets but that they do have responsibility for some SFRY liabilities. Because multiple courts in this district already have held such allocations to be political questions, a finding contrary to those courts would create exactly the sort of "potentiality of embarrassment from multifarious pronouncements by various departments on one question" that *Baker* and *Can* warn against.

Consequently, allocation of SFRY assets or liabilities became a political question in this court once the other district courts so held, even if this court believed that it otherwise would not be a political question. While the traditional process of conforming judicial rulings—circuit efforts to resolve district court splits; Supreme Court efforts to resolve circuit splits—is far from an ideal way to conduct foreign policy, the Second Circuit at least has authority, unlike this court, to prevent inconsistent foreign affairs pronouncements within this district and circuit. To the extent that the prior political question holdings in this district are incorrect, only the Second Circuit, not this court, can issue a holding that conforms the district courts and thus reduces the amount of dangerous inconsis-

tency that the judiciary would be inserting into United States policy regarding SFRY succession.

### B. Plaintiffs' Proposed Methods of Allocating SFRY Liability

■ Plaintiffs offer two alternative methods of allocating the alleged SFRY liabilities among the state defendants. First, plaintiffs propose that this court apply an allocation of SFRY assets and liabilities used by the International Monetary Fund ("IMF"). Second, plaintiffs propose that this court apply joint and several liability. Neither method avoids the above-discussed political questions that any judicial allocation of SFRY assets and liabilities would pose.

#### 1. IMF Allocation

The IMF proposed the following allocation of SFRY assets and liabilities as a basis for the SFRY successor states to obtain IMF membership: FRY, 36.52%; Croatia, 28.49%; Slovenia, 16.39%; Bosnia, 13.20%; and Macedonia, 5.4%. *See* Pls.' Mem.Opp. Slovenia, Bosnia, & Macedonia at 21 (citing Ward.Aff., Ex. K). Plaintiffs argue that the percentages are appropriate for this court to adopt because the United States government's power in the IMF makes the IMF determination proper for a United States court to follow. The United States, however, expressly rejects use of the IMF percentages outside the IMF context because it "pertains only to the IMF. That the United States is a member of the IMF cannot impute that settlement to the Executive Branch's carrying out of its own foreign policy concerning Yugoslavia and the United States-based assets and liabilities of the former Yugoslavia." Tr. at 69 (counsel for United States). Because it would not avoid the problem of judiciary-executive foreign policy dissonance, adoption of the IMF allocation by this court is not a viable way to adjudicate this case.

#### 2. Joint and Several Liability

The idea of holding the state defendants jointly and severally liable for the alleged SFRY liabilities has appeal as a seeming non-allocation that would use a traditional legal practice to avoid explicit judicial declarations on political questions. In reality, however, it would not avoid any political questions, but simply would decide them implicitly and in a chaotic fashion. A holding of joint and several liability would be a holding of equal liability: each SFRY successor would have equal potential responsibility for 100 percent of the SFRY debt. This would not avoid deciding the political questions of SFRY debt allocation any more than would an arbitrary holding of 20 percent liability for each of the five state defendants. A proper political allocation decision would look to any number of considerations, such as each successor's relative economic situation, *see, e.g.,* Ward.Aff., Ex. K (IMF allocation), or the amount of benefit those in each successor state (while each was part of the SFRY) received from the disputed SFRY liabilities, *see, e.g.,* Croatia Mem.Supp.Mot. Dismiss (arguing that "the premises in question were never made available to Croatia or the other successors," *id.* at 9, because by the time the 1991 lease extensions all took effect "fighting already had occurred and Croatia already had declared its independence of the SFRY," *id.* at 8 n. 4). A decision to apportion liability equally would be a decision to ignore all relevant factors that should enter into an appropriate allocation. The fact that it would be an uninformed political decision does not make it any less of a political decision.

Secondarily troubling is the potential for unfair judgment enforcement inherent in joint and several liability for successor nations. As the United States noted, "debts would likely be allocated based on the availability of executable assets, rather than according to an ultimate political settlement of how assets and debts are to be divided." U.S. Mem. at 13. Conversely, a wealthier and more sophisticated successor

could avoid its fair share of the predecessor's liabilities by procuring superior legal representation while a poorer and less sophisticated successor, not represented by attorneys pre-eminent in international law with a rolodex of academic experts, would remain vulnerable to the full extent of the predecessor's liabilities. Regardless of whether these problems are present in this case, they are sufficiently plausible—it is not difficult to imagine a dissolving nation spawning successors of highly disparate wealth—to illustrate the impropriety of a precedent of joint and several liability for successor nations.

The flaws of joint and several liability aside, such a holding would be as contrary to expressed United States foreign policy as any other judicial allocation method:

> [I]mposing joint and several liability, ... debts would likely be allocated based on the availability of executable assets, rather than according to an ultimate political settlement of how assets and debts are to be divided. This would contravene the political powers reserved to the Executive Branch and should not be permitted.

U.S. Mem. at 13. Plaintiffs have cited no cases that apply joint and several liability to the national successorship context. *See* Pls.' Mem.Opp. Slovenia, Bosnia, & Macedonia at 20–21. Accordingly, this court declines to allow this case to proceed on the premise that joint and several liability would avoid the non-justiciable political questions.

C. Limited Duration of Non–Justiciability: Extent of Deference to Political Forum

 Because "political question doctrine must be cautiously invoked," *Can,* 14 F.3d at 163, this court is obliged to clarify the exact scope of, and limitations on, its conclusion that this case currently presents non-justiciable political questions. Fundamentally, the political question doctrine in the national succession context is a rule that the judiciary should defer to a superior forum for the necessary foreign affairs determinations by giving that forum a reasonable opportunity to determine the political questions before the courts do. That superior forum may be national, such as an executive branch declaration of national foreign policy, or international, such as an international dispute resolution process, especially where the executive branch supports that process. Once the appropriate forum determines the political questions of succession, a court no longer should refuse to exercise its jurisdiction over the case. Upon a finding that a case presents political questions of national succession not yet decided by the appropriate forum, the question is whether the judiciary has delayed addressing those questions for long enough to afford that forum a reasonable opportunity to address those questions without judicial interference. After some number of years, further delay of a plaintiff's ability to access the courts becomes inappropriate, extending past the rationale of deference to a superior forum.

 The following are among the factors determining whether the delay has become too lengthy to justify continued delay of adjudication. First is the simple length of time of the succession process. If the succession process remains unfinished with no end in sight, eventually hopes of some eventual political resolution no longer would justify any further delay of adjudication. Second is the degree of completion of the succession process. If dissolution and succession finalize quickly, a court should not wait much longer for a political resolution of any outstanding issues. Third is the extent of ongoing political efforts to resolve the outstanding issues. If there are no political efforts to resolve the outstanding issues long after dissolution and succession become final, a court should not wait further on the premise that political efforts might begin eventually. Finally, there is a role for equitable consideration of the degree to which it would be unjust to delay a plaintiff's day in court. If a plaintiff had little reason to

anticipate the risk that political upheaval might delay liability collection efforts for years, then less delay is equitable than for a plaintiff who knew the possibility of delay.

 Here, all three factors and the equitable considerations militate in favor of allowing continued delay of plaintiffs' litigation efforts in deference to the unsettled political determinations. First, the succession process was not quick, with years of disagreement between the FRY and other nations regarding the legitimacy of their successorships. Second, while the five-state succession outcome is reasonably final now, it is not so clearly stable, in the still-turbulent climate of the region, that the current lack of a final political resolution proves futile the executive branch's policy of waiting for such a resolution. Third, there are international political efforts to resolve those issues that are continuing sufficiently, if slowly, to provide an eventual basis for a more final United States foreign policy regarding successorship. Finally, equitable considerations would allow continued deference and postponement of plaintiffs' claims. Plaintiffs have stressed that SFRY political upheaval, American–Yugoslavian tensions, and even Yugoslavian dissolution were foreseeable at the time of the three lease extensions in August–October 1991:

> At the time the SFRY tenants extended their leases, *the SFRY was on the verge of breaking up,* and relations between the United States and the SFRY were rapidly deteriorating.... [B]y June 1991, ... the United States had suspended economic assistance to the SFRY. Since these events preceded the signing of the lease extensions by several months, FRY cannot credibly assert that the actions taken by the United States government a year later were unforeseeable.... "[I]n June 1991, two of the six Yugoslav republics, Croatia and Slovenia, voted to secede from the [SFRY]. By July, *the country was on the brink of a full-fledged civil war.*

> Over that summer, violence erupted, which ultimately led to a bloody ethnic war."

Pls.' Mem.Opp. FRY at 9, 11 n. 7 (emphases altered) (quoting *767 Third Avenue Assocs. v. United States,* 48 F.3d at 1577 (plaintiffs' alterations)). Clearly, plaintiffs could have anticipated the risk of politically-generated delays in rent collection due to the growing instability of their long-term SFRY tenants. While this consideration does not insulate defendants from liability, it does lessen the degree of unfairness present in delaying plaintiffs' quest for relief. There is always some inequity in requiring an aggrieved party to wait for justice. Compared to the case of a plaintiff who could not have anticipated political delay, however, there is less of the sort of gross inequity that might compel a court to adjudicate otherwise non-justiciable political questions.

This holding does not bar plaintiffs from court permanently. While this court cannot commit to hypothetical future rulings, a proper explanation of the present holding requires some elaboration of its limits. Plaintiffs' claims may become justiciable in one of two situations. First, if the executive branch declares a clear national policy on SFRY successor allocations, and ceases to wait for inchoate international processes, then it will have eliminated much of the rationale for non-justiciability. Second, if there remains no political resolution of the outstanding succession issues, then plaintiffs eventually would be entitled to return to court for adjudication of their claims. Continued judicial refusal to adjudicate would not be warranted, for example, at a future date when the dust has settled on the aftermath of Yugoslav succession, when political efforts to resolve the outstanding succession issues have collapsed, and when the United States has failed to recognize the futility of awaiting a nonexistent international resolution of those issues. In such a situation, with little to which courts could defer, the judiciary would reclaim its familiar role as the im-

perfect forum of last resort for resolving disputes. Because that situation is not on the present horizon, however, deference to non-judicial resolution of the political questions remains appropriate and plaintiffs' claims remain non-justiciable.

### D. Procedure for Political Succession Questions: Abstention Stay, not Dismissal

#### 1. Lack of an Established Dismissal Procedure

■ The state defendants variously offer Fed.R.Civ.P. 12(b)(1), 12(b)(6), and 56 as bases for dismissal. It is unclear what rule properly could dispose of a case presenting political questions of national succession. In some cases, the nature of the parties' submissions determines the choice of dismissal rule. *Compare, e.g., Beogradska Banka,* 1998 WL 661481, at *1 (holding that because motions "rely upon materials outside the pleadings, the Court will treat the defendants' motion as one for summary judgment pursuant to Fed. R.Civ.P. 56 rather than a motion to dismiss") *with Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. at 219 (granting motions to dismiss because plaintiff "is unable to state a claim against Slovenia.... Accordingly, all claims against Slovenia must be dismissed."). Alternatively, a court holding that a case should be dismissed because it presents political succession questions may sidestep the question of exactly which rule applies to that dismissal, even when the court clearly states which rule applies to another dismissal holding in the same case. *See, e.g., Can v. United States,* 820 F.Supp. 106, 116 (S.D.N.Y. 1993) ("[T]he motion ... for an order dismissing this action pursuant to Rule 12(b)(1) ... for lack of subject matter jurisdiction is granted. *Further,* the Court finds that plaintiffs' claims present nonjusticiable political questions that may not properly be decided by the judicial branch." (emphasis added)), *aff'd,* 14 F.3d 160, 162 (2d Cir.1994) ("We ... affirm the judgment of the district court on political-question grounds, and do not reach ... the district court's ... conclusion that it lacked subject matter jurisdiction.").

The confusion as to which dismissal rule applies to political questions of national succession is understandable because no dismissal type truly comports with the temporary nature of the non-justiciability. Dismissal with prejudice would eliminate plaintiffs' ability to return to federal court for the necessary eventual adjudication; dismissal without prejudice would yield wasteful repetition of litigation efforts and would jeopardize plaintiffs' ability to return. *See infra* Part II.D.2.

#### 2. Stay Order as Procedure for Deferring to Determination of Another Sovereign

The more accurate view of how political questions of national succession impact a case procedurally is that they lead not to a dismissal order, but instead to a stay order under principles of abstention.[2] Abstention principles and procedures apply cleanly to the problem of adjudicating suc-

---

**2.** Variations in focus support different abstention doctrines:

> The three constitutionally- or comity-based grounds for abstention are *Pullman* abstention, ... which is proper when a state court determination of a question of state law might moot or change a federal constitutional issue presented in a federal court case; *Burford* abstention, ... which is proper when questions of state law in which the state has expressed a desire to establish a coherent policy with respect to a matter of substantial public concern are presented; and *Younger* abstention, ... which is proper when federal jurisdiction has been invoked for the purpose of restraining certain state proceedings.
> *Trent v. Dial Med. of Fla., Inc.,* 33 F.3d 217, 223 n. 5 (3d Cir.1994). Additionally, exceptional circumstances could support abstention based on "principles ... which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts." *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) ("*Colorado River* abstention").

cession issues because, especially in the national succession context, abstention doctrine and political question doctrine arise from similar concerns. "Federal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 723, 116 S.Ct. 1712, 1724, 135 L.Ed.2d 1 (1996). *Quackenbush* addressed *Burford* abstention, a doctrine of "abstention on grounds of comity with the States where ... federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1245 (discussing *Burford* abstention) (citations omitted). Just as comity in the federalism context requires deference to state processes and efforts to establish coherent policies on matters of substantial public concern, so does comity in the international context (in conjunction with separation of powers principles) require deference to international and executive branch processes and efforts to establish coherent policies on matters of substantial public concern.

*Quackenbush* held that when *Burford* abstention is appropriate in a damages action, a court cannot dismiss the case entirely, but only can stay the case as long as necessary toward the goal of deferring to the pertinent state efforts. 517 U.S. at 730, 116 S.Ct. at 1727–28 ("In ... damages actions, we have only permitted a federal court to 'withhold action until the state proceedings have concluded,' that is, we have permitted federal courts applying abstention principles in damages actions to enter a stay, but we have not permitted them to dismiss the action altogether." (quoting *Growe v. Emison,* 507 U.S. 25, 32, 113 S.Ct. 1075, 1080, 122 L.Ed.2d 388 (1993))). The *Quackenbush* rule that abstention must be via stay rather than via dismissal applies to all doctrines of "abstention, under *Burford* or otherwise," *De-Mauro v. DeMauro,* 115 F.3d 94, 98 (1st

Cir.1997), and already had been the established rule under other abstention doctrines, *see Deakins v. Monaghan,* 484 U.S. 193, 202, 108 S.Ct. 523, 529–30, 98 L.Ed.2d 529 (1988) (holding that "even if the *Younger* doctrine requires abstention here, the District Court has no discretion to dismiss rather than to stay claims for monetary relief that cannot be redressed in the state proceeding" because of the "rule that requires a District Court to stay rather than dismiss claims that are not cognizable in the parallel state proceeding"); *id.,* 484 U.S. at 210 n. 5, 108 S.Ct. at 533 n. 5 (White, J., concurring, joined by O'Connor, J.) (stating that same result of abstention via stay, not dismissal, would apply under *Colorado River* abstention doctrine).

■ Where principles of comity and constitutional structure lead a court to abstain from a damages action in deference to another forum's determinations, a dismissal without prejudice is not a viable alternative to a stay, for several reasons that various courts identically have noted.

> To permit dismissal of a claim for damages when such relief may not be obtained in any pending state proceeding is surely not required by any notions of comity. Moreover, dismissal might foreclose, on statute of limitations grounds, the subsequent pursuit of a damages action in federal court in the event that the state court holds that a violation of constitutional rights took place. No doubt this is why Courts of Appeals which have applied *Younger* to damages actions have ordered stays, and not dismissals, of damages claims to which *Younger* applies.

*Deakins,* 484 U.S. at 206, 108 S.Ct. at 531 (White, J., concurring, joined by O'Connor, J.); *see also Lumen Constr., Inc. v. Brant Constr. Co.,* 780 F.2d 691, 698 (7th Cir. 1985) ("[D]ismissal, even without prejudice, creates a risk that the federal plaintiff will be time-barred from reinstating his federal suit if the state proceeding does not result in a final decision on the merits.

A stay, by contrast, permits the federal court to retain jurisdiction in case the state court action does not meet its anticipated end."); *Retail Marketing Network, Inc. v. Actmedia, Inc.*, No. 3:96CV800 AHN, 1996 WL 684416, at *5 (D.Conn. Oct.18, 1996) ("[T]he court abstains from … and stays this action to insure that Retail is not time-barred from reinstating its federal suit if the state proceeding does not result in a final decision on the merits.").

Inefficient use of the court's and the parties' resources is another problem that dismissal without prejudice would generate in this context. Whether this court dismisses or stays this action, plaintiffs are free to make an eventual request that its claims be adjudicated once the political questions of SFRY succession dissipate. A dismissal without prejudice would require the following eight steps when the case returns to federal court: (a) that plaintiffs re-file the action; (b) that a new judge adopt this case; (c) that the FRY re-file its cross-claim; and (d)–(h) that each of the five state defendants re-file its dispositive motion. This repetition would occur more than once if, the first time they re-file, plaintiffs are unsuccessful in arguing that the political questions have dissipated.[3] In contrast, with a stay order, a motion to lift the stay would be the extent of the court's and the parties' efforts whenever plaintiffs seek to return to court.

A stay order, by lessening both the burdensomeness of the case's return to court and the risks of barriers to that return such as statutes of limitations, ensures "that the federal forum remain available to a plaintiff" if deferring to political resolution of SFRY succession issues "prove[s] not to be 'an adequate vehicle for the complete and prompt resolution of the issues.'" *Selmon v. Portsmouth Drive Condominium Ass'n*, 89 F.3d 406, 410 (7th Cir.1996) (quoting *Moses H. Cone Mem.*

*Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 28, 103 S.Ct. 927, 943, 74 L.Ed.2d 765 (1983)). This balances the imperatives of allowing the political succession process "to go forward without interference … while enforcing the duty of federal courts to assume jurisdiction where jurisdiction properly exists." *Deakins*, 484 U.S. at 202–03, 108 S.Ct. at 530.

### 3. Applying Abstention Stay Rule in Context of Deferring to Executive Branch

■■■ Though the rule of abstaining via stay rather than via dismissal derives from formal "abstention" cases, it also applies to the context of judicial deference to executive branch determinations that, while potentially resolving critical issues in a case, are not proceedings offering the "relief which only a federal court may grant" in the case. *Messinger v. Bldg. Contractors Ass'n. Inc.*, 703 F.Supp. 320, 324 (S.D.N.Y. 1989). *Messinger* held that although the court had jurisdiction over the unfair labor practices charges, it would defer to the National Labor Relations Board's concurrent jurisdiction over some, but not all, of the issues in the case. In choosing a procedural means for that deferral, the court held that "a stay is preferable to outright dismissal. As with abstention cases in which a federal court defers to pending state action on the same issue, dismissal creates a risk that the union might be time-barred from reinstituting the lawsuit if the NLRB fails to render a final decision on the merits." *Id.*

The rule that a stay is the proper means of deferring to another forum's issue determinations extends to the executive branch context because it reflects a broadly applicable principle: "[w]here a court suspends proceedings in order to give preliminary deference to an independent adjudicating body but further judicial proceed-

---

**3.** The risk that the first re-filing might be unsuccessful is particularly high in this case. In contrast to a case of abstention based on deference to a specific proceeding with a clear end date, here the end date of abstention would be a judgment call, not an obvious point.

ings are contemplated, then jurisdiction should be retained by a stay of proceedings, not relinquished by a dismissal." *Id.* (quoting *Northern Calif. Dist. Council of Hod Carriers, Bldg. & Constr. Laborers v. Opinski,* 673 F.2d 1074, 1076 (9th Cir.1982) (Kennedy, J.)). The abstention precedents emphasize that it is particularly critical to choose a stay rather than a dismissal when the forum to which the court defers does not offer a plaintiff the remedies a federal court can provide. *See, e.g., Simpson v. Rowan,* 73 F.3d 134, 138–39 (7th Cir.1995) (reversing dismissal of § 1983 action, and ordering a stay, because in *Younger* abstention, " 'claims for monetary relief also are stayed—but should not be dismissed outright if the claims for damages cannot be redressed in the state proceeding.' The practical effect of the district court's dismissal is that Simpson is now time-barred.... [T]he district court should have retained jurisdiction over Simpson's § 1983 claims pending the outcome of the state proceedings." (quoting *Nelson v. Murphy,* 44 F.3d 497, 503 (7th Cir.1995))); *Messinger,* 703 F.Supp. at 324.

The deference that is necessary here is deference to an executive branch foreign policy determination, which itself is a policy of deference to ongoing international efforts. The principles underlying the choice of a stay over a dismissal apply equally when the deference motivating abstention bases not on constitutional *federalism* and *federal-state* comity, but instead, as here, on constitutional *separation of powers* and *national-international* comity. Deference is proper not only on principles of comity, but also on principles of judicial manageability, because the anticipated policy determinations would facilitate apportionment of liabilities in any judgment for plaintiffs. Neither the executive branch nor the international processes actually offer plaintiffs any relief, however; they simply aim to clarify the state defendants' now-indeterminate duties to assume SFRY liabilities, including the alleged liabilities to plaintiff. Thus, while the rationale for deference justifies delay-

ing adjudication for a reasonable time to allow the anticipated policy determinations, it does not justify permanently denying adjudication. The presence of political questions here justifies only a holding of temporary non-justiciability that avoids prejudicing the eventual adjudication, which plaintiffs cannot obtain elsewhere, of plaintiffs' rights against defendants. Accordingly, the case must be stayed and placed on the suspense calendar until further action by this court.

### III. Conclusion

For the reasons given above, the court holds that this action currently presents non-justiciable political questions. Accordingly, the court stays all matters in the case and places the case on the suspense calendar.