**767 THIRD AVENUE ASSOCIATES and Sage Realty Corporation, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 94–5075.**

United States Court of Appeals, Federal Circuit.

March 3, 1995.

Robert John Ward, Richards & O'Neil, New York City, argued for plaintiffs-appellants. With him on the brief were Shari C. Reig and Peter W. Smith.

Joan M. Pepin, Atty., Dept. of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were Lois J. Schiffer, Acting Asst. Atty. Gen., David C. Shilton, James E. Brookshire and Alan Brenner, Attys.

Before LOURIE, Circuit Judge, BENNETT, Senior Circuit Judge, and SCHALL, Circuit Judge.

LOURIE, Circuit Judge.

767 Third Avenue Associates and Sage Realty Corporation (collectively "Sage") appeal from a judgment of the United States Court of Federal Claims granting the government's motion for summary judgment. *767 Third Ave. Assocs. v. United States,* 30 Fed.Cl. 216 (1993). Because Sage failed to establish that the government's actions effected a taking of private property without compensation in violation of the Fifth Amendment of the United States Constitution, we affirm.

## BACKGROUND

Sage Realty Corporation, as agent for 767 Third Avenue Associates, entered into leases in 1981 with three organizations from the Socialist Federal Republic of Yugoslavia (SFRY). The Consulate General of the Socialist Federal Republic of Yugoslavia (Consulate) and the Yugoslav Press and Cultural Center (Cultural Center) leased the 17th and 18th floors, respectively, of the premises at 767 Third Avenue, New York City, New York, beginning in February 1981. The Yugoslavia Chamber of Economy (Chamber of Economy) leased a portion of the 24th floor of the same building beginning in March 1981. Each lease was for a ten-year period.

Article 45 of each lease provided options for extensions. It read as follows:

### ARTICLE 45

### EXTENSIONS OF TERM

45.01 Tenant shall have the right to extend the term of this Lease for two (2) additional, consecutive terms of five (5) years each.... The options contained in this Article 45 to extend the term of this Lease shall in each instance be subject to the following terms and conditions: *(i) Tenant shall give Landlord notice (hereinafter called the "Extension Notice") of its election to extend the term of this Lease at least eighteen (18) months but nor [sic] more than twenty-four (24) months prior*

*to the commencement of the relevant Extension Term....*

....

45.03 If Tenant does not send an Extension Notice pursuant to the provisions of Section 45.01 hereof, this Article 45 shall have no further force or effect, and the term of this Lease shall expire on the last day of the initial term thereof or on the last day of the Extension Term then in progress, as the case may be.

None of the tenants provided an Extension Notice at least eighteen months prior to the expiration of the leases. However, less than one month prior to the expiration of its lease, the Chamber of Economy entered into a written agreement extending its lease to August 31, 1996. Likewise, after the expiration of its leases, the Cultural Center on October 21, and the Consulate on October 28, 1991, entered into similar written agreements extending its leases to September 30, 1994, and August 31, 1996, respectively.

At the time the tenants extended their leases, the SFRY was experiencing significant turmoil. In June 1991, two of the six Yugoslav republics, Croatia and Slovenia, voted to secede from the SFRY. By July, the country was on the brink of a full-fledged civil war. Over that summer, violence erupted, which ultimately led to a bloody ethnic war. On May 24, 1992, the United States formally acknowledged that the SFRY ceased to exist. *See 767 Third Ave.,* 30 Fed.Cl. at 218.

One day later, the United States Department of the Treasury ordered the closure of the Consulate, including the Cultural Center, and directed that operations at these offices cease by May 31, 1992. Shortly thereafter, on May 30, President Bush declared that "all property and interests in property in the name of the Government of the Socialist Federal Republic of Yugoslavia or the Government of the Federal Republic of Yugoslavia that are in the United States ... are hereby blocked." Exec.Order No. 12,808, 57 Fed. Reg. 23,299 (1992). This order specifically included the Chamber of Economy. *Id.* at 23,300. A second Executive Order issued on June 5 in which the President expanded the sanctions, freezing Yugoslav assets in the United States. Exec.Order No. 12,810, 57 Fed.Reg. 24,347 (1992). These Executive Orders were issued pursuant to the President's delegated authority under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (1988 & Supp. V 1993), which was enacted in 1977.

In response to the United States government's actions, the Cultural Center and the Consulate sent lease termination notices on May 27 and 28, respectively. Sage responded on May 29 by notifying them that they were in default of the leases due to arrears in rent payments. Sage sent a similar notice to the Chamber of Economy on June 11, 1992. Because the three tenants did not cure their defaults, Sage filed suit against them in the United States District Court for the Southern District of New York on July 2, 1992, seeking past due rent. Sage, however, did not seek damages for the default by the SFRY organizations pursuant to Article 18 of the lease agreements, which provided for damages.[1]

Thereafter, on July 9, 1992, as part of the implementation of President Bush's Executive Orders, Treasury agents entered and inspected the offices of the Yugoslav organizations at 767 Third Avenue. After the inspection and upon leaving, the agents posted the following notice on the doors of the three offices:

1. Article 18 read as follows:

DAMAGES

18.01 If this Lease is terminated ... by reason of default hereunder on the part of Tenant, Tenant shall pay to Landlord as damages, at the election of Landlord, either

(a) a sum which at the time of such termination of this Lease ... represents the then value of the excess, if any of

(1) the aggregate of the fixed annual rent and the additional rent payable hereunder which would have been payable by Tenant ... had this Lease not so terminated ... over

(2) the aggregate rental value of the demised premises for the same period, or

(b) sums equal to the fixed annual rent and the additional rent ... payable hereunder which would have been payable by Tenant had this Lease not so terminated ..., provided, however, that if Landlord shall re-let ... Landlord shall credit Tenant with the net rents received by Landlord from such re-letting....

THESE PREMISES HAVE BEEN CLOSED BY ORDER OF THE UNITED STATES DEPARTMENT OF THE TREASURY.

. . . .

NO ACCESS TO THESE PREMISES IS PERMITTED WITHOUT SPECIFIC AUTHORIZATION FROM THE OFFICE OF FOREIGN ASSETS CONTROL, U.S. TREASURY DEPARTMENT.

FOR FURTHER INFORMATION CONTACT THE OFFICE OF FOREIGN ASSETS CONTROL AT 202/622-2430.

Criminal Penalties for violation of this order may include up to ten years imprisonment, $500,000 in corporate, and $250,000 in individual fines. In addition, civil penalties of up to $10,000 per count may be imposed administratively.

On one occasion after these notices were posted, Sage requested access to the premises in order to ensure the building's safety. The government granted the request. Sage made no other such access requests. On August 28, 1992, the government sent a letter informing Sage that it was "free to take possession of the space formerly occupied by the Yugoslav Consulate General." The letter further provided that Sage "may disregard and remove the sign posted there." Similar letters on September 18 and September 23 notified Sage that it could take possession of the premises formerly occupied by the Cultural Center and the Chamber of Economy.

Prior to the posting of the notices restricting access to the premises, Sage had filed suit against the government in the Court of Federal Claims on June 12, 1992. Sage alleged that the closure of the Consulate, Cultural Center, and Chamber of Economy constituted a regulatory taking of its property, consisting of the benefits of its leases, for which it was entitled to just compensation under the Fifth Amendment. After the government posted the notices, Sage amended its complaint to allege that the government physically seized the SFRY offices by such posting, which it believed constituted a taking for which it was entitled to just compensation. In response, the government filed a motion for summary judgment, which the Court of Federal Claims granted. *767 Third Ave.*, 30 Fed.Cl. at 217.

The court held that Sage had no compensable investment-backed expectation "to be free from government interference with [its] contract rights." [2] *Id.* at 222. In so holding, the court determined that the appropriate date for analysis of Sage's expectations was 1991, when the parties extended the leases, not 1981, when the parties initially entered into the lease agreements. *Id.* at 220. The court indicated, however, that even if 1981 were the appropriate year to analyze Sage's expectations, Sage still had no investment-backed expectation to be free from government interference with its interests in the leases. Therefore, the court held that Sage failed to establish that there was a taking of property within the meaning of the Fifth Amendment.

The trial court further held that the government's actions did not constitute a *per se* physical taking because the government "did not take physical possession of the subject premises and Sage was never physically denied access to the property on those occasions when it asked for access." *Id.* at 222. In so finding, the court held that posting signs and restricting access at the premises did not constitute a separate physical taking. *Id.* Pursuant to the court's grant of summary judgment, the court issued an order to dismiss Sage's complaint. Sage now appeals.

## DISCUSSION

Whether the Court of Federal Claims properly granted summary judgment is "a question of law subject to complete and independent review" by this court. *Tabb Lakes,*

---

2. The parties do not dispute that Sage's right to income under the leases is "property" within the meaning of the Fifth Amendment. Intangible interests, including those created by contracts, have been found to be property for purposes of the Fifth Amendment Takings Clause. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S.

211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) ("Contracts may create rights of property...."); *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04, 104 S.Ct. 2862, 2873-74, 81 L.Ed.2d 815 (1984) (trade secrets may be "property" under Takings Clause).

*Ltd. v. United States,* 10 F.3d 796, 799 (Fed. Cir.1993) (citation omitted). Thus, we review the record *de novo* to determine whether any genuine issue of material fact exists, and if not, whether the movant is entitled to a judgment as a matter of law. *Id.;* Fed. R.Civ.P. 56(c).

## I. Alleged Regulatory Taking

Sage first argues that the court erred in granting summary judgment on the fact-intensive question concerning whether there was a regulatory taking, because numerous issues of fact exist as to whether Sage's expectations were reasonable given the regulatory environment.[3] Sage also argues that the proper date for measuring its expectations is 1981, when its leases originally became effective, not 1991, when they were extended. In support, Sage relies on New York case law, which provides that a tenant may invoke equitable principles to require a landlord to accept the renewal of a lease even after a tenant's failure to provide proper notice. *See J.N.A. Realty Corp. v. Cross Bay Chelsea Inc.,* 42 N.Y.2d 392, 397 N.Y.S.2d 958, 366 N.E.2d 1313 (1977). Sage concludes that because it believed that it was required to renew the leases despite the lack of proper notice, the appropriate date for analysis of Sage's expectations is 1981, when the original leases were signed. According to Sage, "it is inconceivable that Sage should have or could have reasonably foreseen in 1981 that the former Yugoslavia—which at that time was stable, pro-Western, and even preparing to host the 1984 Winter Olympics—more than ten years later would become embroiled in a civil war which would prompt the United States to respond by selectively closing a few SFRY offices and expelling their staffs."[4]

Sage further argues that even if 1991 is the correct year to analyze Sage's investment-backed expectations, the court overlooked numerous questions of material fact in connection with Sage's expectations. In particular, Sage argues that the government did not refute the affidavit of Sage's Executive Vice President, which stated that neither he nor anyone else at Sage was a "foreign policy expert" who could have foreseen the May 1992 and July 1992 Executive Orders. Moreover, Sage asserts that its past experience leasing office space to other foreign entities whose countries were involved in domestic turmoil led it to believe that the United States government would not evict government officials of such countries.

The government counters that Sage's subjective arguments that it had a reasonable investment-backed expectation do not raise any issues of material fact sufficient to avoid summary judgment. In support, the government argues that it makes no difference when Sage's expectations are evaluated. Whether Sage's expectations are evaluated in 1981 or 1991, it could not have had any reasonable investment-backed expectation to be free from government interference, given the government's authority with respect to foreign government presence in the United States. Moreover, the government asserts that Sage's losses were not due to the government's actions; rather, Sage's losses were caused by the failure of the SFRY groups to pay rent and by Sage's own decision not to seek damages from the SFRY organizations pursuant to the terms of the leases. We agree with the government. There is no genuine issue of material fact in this case, the only issue being one of law, resolvable in favor of the government.

3. Sage does not otherwise challenge the validity of the government's actions in this case. When analyzing takings cases under the Tucker Act, the Court of Federal Claims must assume that the government's actions are a proper exercise of statutory or regulatory authority. *See Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 898–99 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

4. Sage also argues that the Chamber of Economy was not a consular office of the former SFRY and that therefore this court should perform a differ-

ent takings analysis with regard to the Chamber of Economy because it was "not even linked to a foreign government." We disagree. Although the Chamber of Economy is not a consular office, we do not find any evidence in the record that indicates the Chamber of Economy was not linked to the SFRY government. To the contrary, Executive Orders 12,808 and 12,810 specifically define the "Government of the Socialist Federal Republic of Yugoslavia" to include the Chamber of Economy.

The Fifth Amendment provides, in pertinent part: "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The purpose of the Fifth Amendment is to prevent the "[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)); *see also Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1571 (Fed.Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995).

■ A taking may occur as a result of a regulatory action that is neither a physical invasion nor a physical restraint. This proposition is based on the oft-cited maxim of Justice Holmes in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415, 43 S.Ct. at 160. However, not all regulatory actions will constitute a regulatory taking. *See id.* at 413, 43 S.Ct. at 159 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.").

To analyze whether a regulation goes so far as to constitute a taking, the Supreme Court has indicated that there is no set formula; the determination depends upon the particular circumstances of the case. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. "Ordinarily, the Court must engage in 'essentially ad hoc, factual inquiries.'" *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982) (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659). To aid in this determination the Supreme Court has "identified three factors of 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental ac-

tion.'" *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986) (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659).

■ Even though a regulatory taking analysis is normally ad hoc and fact-intensive, the United States may still be entitled to judgment as a matter of law. *See Chang v. United States,* 859 F.2d 893, 898 (Fed.Cir. 1988) (affirming dismissal of Fifth Amendment claim for failure to state a claim upon which relief could be granted). Such a case is the one before us. Here, Sage had no reasonable investment-backed expectation to be free from government interference with its leases to the SFRY organizations.

Prior to 1981, statutory and constitutional authority existed that permitted the government to take various actions against other countries, including the blocking of assets and closure of foreign government offices. *See Dames & Moore v. Regan,* 453 U.S. 654, 675, 101 S.Ct. 2972, 2984, 69 L.Ed.2d 918 (1981) (concluding that the IEEPA constitutes congressional authorization for the President to order the transfer of Iranian assets). In particular, the IEEPA authorized such actions "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). President Carter had used that authority to block Iranian government property and prohibit certain transactions with Iran in 1980 and 1981. Exec. Order No. 12,111, 45 Fed.Reg. 26,685 (1980) (prohibiting certain transactions with Iran); Exec. Order No. 12,170, 44 Fed.Reg. 65,729 (1979) (blocking Iranian government property). That authority has been used on several other occasions since 1981. *E.g.,* Exec. Order No. 12,513, 50 Fed.Reg. 18,629 (1985) (prohibiting trade with Nicaragua); Exec. Order No. 12,543, 51 Fed.Reg. 875 (1986) (prohibiting certain transactions with Libya); Exec. Order No. 12,722, 55 Fed.Reg. 31,803 (1990) (blocking Iraqi government property and prohibiting transactions with Iraq); *see also Chang,* 859 F.2d at 896 (Executive Order No. 12,543 prevented plaintiffs

from marketing services in Libya but did not result in compensable taking).

■ In light of this precedent, Sage could not have had a reasonable investment-backed expectation in either 1981 or 1991 that its leases to the SFRY organizations would proceed totally without interference by the government. A landlord leasing office space to organizations of the SFRY in 1981 did so against the backdrop of the government's foreign policy power. Such a power may rarely be used in the way it was here, but it is part of our legal framework and its existence must be considered in any reasonable expectations analysis.

■ Sage, as a member of the public, was on notice that the government, pursuant to its statutory and constitutional authority, could close a foreign government's offices and freeze its assets. The government never guaranteed Sage that it would not exercise its power to close the SFRY government offices. Nor did the government give assurance that the SFRY organizations would perform their obligations under the leases. The government is not an insurer that foreign governments will meet their obligations under lease agreements that are broken as a result of valid United States government actions. Moreover, if the government were to be liable to a lessor under a takings theory, it might logically follow that it would also be liable to the lessee, who was actually the party the government proceeded against. Such is not the law, for it would encumber the sovereign power of the government to expel foreign government agencies and to block assets when, in the exercise of its foreign policy powers, it decides it is necessary to do so. *See Dames*, 453 U.S. at 673, 101 S.Ct. at 2983 (attachments by American claimants against Iranian assets subordinate to President's power under the IEEPA).

As this court has stated, "[w]hen dealing in foreign commerce, the possibility of changing world circumstances and a corresponding response by the United States government can never be completely discounted." *Chang,*

859 F.2d at 897. This statement is particularly apt with respect to Yugoslavia. In 1981, that country was under autocratic rule and experiencing national and ethnic rivalry among the six republics.[5] Even though the SFRY remained a nonaligned nation, the proximity of the Soviet Union was a factor with important foreign policy implications. The powerful dictator, Josip Broz Tito, had recently died in 1980, ending his 35-year regime as leader of the SFRY. The future of the Balkans, a region which had experienced turmoil for generations, was uncertain. Thus, we conclude that Sage could not have had a reasonable expectation of non-interference from the United States government. That being so clearly the case, the other factors need not be considered. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (no taking in case in which party had no "reasonable investment-backed expectation" that government would not disclose trade secret data submitted to the Environmental Protection Agency). The government was entitled to summary judgment that no regulatory taking occurred.

■ An additional reason for affirming the trial court's decision is that the Supreme Court has held that no taking occurs when, as occurred in this case, expectations under a contract are merely frustrated by lawful government action not directed against the takings claimant. *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923). In *Omnia,* the Court recognized that a contract right is property within the meaning of the Fifth Amendment. However, it denied the takings claim of a steel manufacturer's customer whose contract was rendered impossible of performance because the government requisitioned the entire production of steel from the manufacturer during World War I. The Court found that "there was no acquisition of the obligation or [the customer's] right to enforce it." *Id.* at 510–11, 43 S.Ct. at 438. It further found that the customer's contract with the

---

5. For a discussion of the political, social, and economic background of the SFRY and the Balkan region in the late 1970s and early 1980s, see BARBARA JELAVICH, HISTORY OF THE BAL- KANS—TWENTIETH CENTURY (1983). A more in-depth analysis of the SFRY through 1990 is available in YUGOSLAVIA: A COUNTRY STUDY (Glenn E. Curtis ed., 3d ed. 1992).

**1582**

steel mill was merely "frustrated" and that there was no taking. The Supreme Court stated:

> [T]he contract consists in the agreement and obligation to perform. If one makes a contract for the personal services of another or for the sale and delivery of property, the Government, by drafting one of the parties into the army, or by requisitioning the subject-matter, does not thereby take the contract.

*Omnia*, 261 U.S. at 511, 43 S.Ct. at 438.

In *NL Industries, Inc. v. United States*, 839 F.2d 1578 (Fed.Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 63, 102 L.Ed.2d 41 (1988), we followed the holding of the Supreme Court in *Omnia* and held that "frustration of a business by loss of a customer was not a taking." 839 F.2d at 1579. NL Industries (NL) had contracted with Allied General Nuclear Services (AGNS) to transport nuclear waste to AGNS's proposed reprocessing facility. *NL Indus., Inc. v. United States*, 12 Cl.Ct. 391, 393–94 (1987), *aff'd*, 839 F.2d 1578 (Fed.Cir.), *cert. denied*, 488 U.S. 820, 109 S.Ct. 63, 102 L.Ed.2d 41 (1988). Thereafter, the government placed a moratorium on AGNS's pending application for a license to operate the reprocessing facility. *Id.* at 395. Although the government's actions were targeted at AGNS, not NL Industries, NL's contract with AGNS was thereby frustrated. Relying on *Omnia*, this court affirmed the trial court's denial of NL's takings claim. Such precedent is applicable to this case because the government here did not take action against Sage. It may have frustrated the achievement of Sage's contractual rights with the SFRY, but that did not amount to a taking.

Sage argues that the decisions in *Omnia* and *NL Industries* are contrary to. more recent case authority. In particular, Sage points to *Penn Central* and *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir.1990), for the proposition that any government regulation may constitute a taking if the action is contrary to the owner's reasonable expectations and deprives the owner of viable use of all or a portion of its property. Sage therefore concludes that this court must perform the ad hoc regulatory takings analy-

sis outlined in *Penn Central* for *any* claim that government regulation is contrary to a property owner's reasonable . expectations. We disagree, although we have, as noted above, performed a *Penn Central* takings analysis and concluded that Sage had no reasonable expectation to be free of government interference.

The cases relied on by Sage all involve government actions which regulated both the plaintiff and the plaintiff's property interest. *Penn Central*, 438 U.S. at 107, 98 S.Ct. at 2650–51 ("[W]e must decide whether the application of [the regulation] to the [plaintiff's property interest] has 'taken' its owners' property in violation of the Fifth and Fourteenth Amendments."); *United Nuclear*, 912 F.2d at 1437 ("[T]he property interest that is the subject of the taking claim is United's leasehold interest in the minerals, which the government took by preventing United from mining under the leases . . . ."). These cases are not inconsistent with the principle that no interest is taken when a contract expectation is merely frustrated by a regulation directed toward a different party or property interest. *E.g., Galloway Farms, Inc. v. United States*, 834 F.2d 998 (Fed.Cir.1987) (losses due to grain embargo against the Soviet Union not compensable to farmer under the Fifth Amendment); *PVM Redwood Co. v. United States*, 686 F.2d 1327 (9th Cir.1982) (denial of supply of lumber to sawmill operator due to passage of Redwood Park Expansion Act merely a frustration of contract expectancy), *cert. denied*, 459 U.S. 1106, 103 S.Ct. 731, 74 L.Ed.2d 955 (1983); *Kearney & Trecker Corp. v. United States*, 688 F.2d 780, 783, 231 Ct.Cl. 571 (1982) (no taking when "government did not appropriate any of the rights the plaintiff had under the contract but only made it impossible for the plaintiff to perform it."), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 929 (1983).

The government, by closing the consulate and blocking the SFRY's assets, did not take any property interest of Sage. Sage merely had an expectation of future income from rent payments by the SFRY organizations. The SFRY organizations still had a legal obligation to pay rent, which they disavowed

when the government blocked the SFRY's assets and closed the SFRY government offices. The government neither acquired from Sage the SFRY organizations' obligations to pay rent nor deprived Sage of any right to enforce its agreements. Sage's remedy, if any, lay against the SFRY organizations, which defaulted on their lease obligations. Article 18 of the leases specifically provided damage remedies that Sage could have attempted to enforce in its district court suit. The government's actions in this case thus did not take Sage's interests in the leases.

## II. Alleged *Per Se* Taking

Sage further argues that the court erred in failing to find that a *per se* taking occurred when the government denied Sage access to the premises at 767 Third Avenue. Sage bases its argument on the terms of the notice posted by the Treasury Department at the premises. Analogizing the present case to *Loretto,* 458 U.S. at 419, 102 S.Ct. at 3167, and *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573 (Fed.Cir.1993), Sage asserts that the government, by posting a sign that warned potential trespassers of severe criminal and civil penalties, effectively occupied the premises. According to Sage, such action was "the functional equivalent of placing armed troops at the doors." Therefore, Sage asserts that the government's actions were compensable as a *per se* taking as a matter of law. We disagree.

The Supreme Court has described two categories of regulatory action that constitute *per se* takings requiring compensation "without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas v. South Carolina Coastal Council,* — U.S. —, —, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). First, regulations that compel any permanent physical occupation of an owner's property require compensation. *Id.; see also Loretto,* 458 U.S. at 426, 102 S.Ct. at 3171 (New York law requiring landlords to place cable facilities in apartment buildings was a permanent physical occupation and thus constituted a compensable taking); *Skip Kirchdorfer,* 6 F.3d at 1582 (government's physical occupation of warehouse

constituted a compensable taking). Second, regulations that deny "all economically beneficial or productive use of land" also require compensation. *Lucas,* — U.S. at —, 112 S.Ct. at 2893; *see also Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1182 (Fed.Cir.1994) (denial of permit to fill land for development purposes constituted a total taking of owner's property interest).

Neither has occurred here and Sage's reliance on *Loretto* and *Skip Kirchdorfer* is misplaced. In *Loretto,* the Supreme Court held that a New York statute requiring a landlord to permit installation of cable television facilities on the landlord's property constituted a permanent physical occupation of property. The installation "involved a direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space [on] the roof and along the building's exterior wall." *Loretto,* 458 U.S. at 438, 102 S.Ct. at 3177. The court found that such government action is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Id.* at 432, 102 S.Ct. at 3174. In *Skip Kirchdorfer,* this court held that the government's seizure and occupation of a building constituted a *per se* taking. The government had physically taken the premises, "complete with broken locks at early morning hours." *Skip Kirchdorfer,* 6 F.3d at 1582. After physically taking the premises, the government posted guards at the entrance and controlled access to the building. *Id.* at 1577.

The government's actions in this case, however, are not comparable. The government did not physically occupy the premises at 767 Third Avenue. Putting aside the fact that the notices were in effect for less than three months, the locks were not changed, the doors were not broken down, a guard was not placed at the door. No plates, boxes, wires, or bolts were attached to the premises. Sage was granted access to the building the only time it requested access. We do not agree that the placing of a notice on the door of the premises was "the functional equivalent of placing armed troops at the doors." Although the notice was backed by the force of law, it did not physically prevent

Sage from entering the premises, and access was available when requested. Because the government did not physically occupy the premises at 767 Third Avenue, the government's actions did not rise to the level of a *per se Loretto*-type physical taking.

Further, we agree with the government that, if anything, the posting of the notice imposed only a non-compensable regulatory scheme that blocked access to the premises without authorization.[6] The Supreme Court has stated that "the mere assertion of a regulatory jurisdiction by a governmental body does not constitute a regulatory taking." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). Moreover, "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." *Id.* at 127, 106 S.Ct. at 459. It is true that, in this case, the government barred access to the premises without permission, rather than just restricting use of the premises. Nevertheless, we do not believe it can be said that the government's actions denied Sage all economically viable use of its property. We do not know what uses could have been made of the property during the short period of time the notices were posted. We do know, however, that the government did not deny Sage the one request it made concerning use of the property. It is also clear that the government's actions were directed to keeping the SFRY organizations out of the property,

not preventing use by Sage. Since the SFRY organizations had terminated their leases, Sage might well have made other uses of the offices. It failed to request any such uses, however. Sage's failure to explore all possibilities serves to bar any regulatory taking claim. *See Tabb Lakes,* 10 F.3d at 801 ("As a matter of law, the possibility of a permit precludes the order itself from constituting a taking. Plaintiff was not precluded from development; it was precluded from development without a permit.") (citation omitted).

We have considered all the other arguments raised by Sage, but find them not persuasive.

### CONCLUSION

The government's actions in closing the SFRY government offices and posting notices at the premises of 767 Third Avenue did not effect takings of private property for purposes of the Fifth Amendment. Accordingly, we affirm the Court of Federal Claims's grant of the government's motion for summary judgment.

*AFFIRMED.*

---

**6.** We note that Sage has neither argued nor presented evidence that the posting of the notices met the various factors set forth in *Penn Central* for proving a regulatory taking.