**767 THIRD AVENUE ASSOCIATES, Carlyle Limited Partnership–XI, Melvyn Kaufman, and Robert Kaufman, Plaintiffs–Appellants,**

v.

**CONSULATE GENERAL OF SOCIALIST FEDERAL REPUBLIC OF YUGOSLAVIA, Yugoslav Press and Cultural Center, Yugoslav Chamber of Economy, Federal Republic of Yugoslavia, Republic of Bosnia–Herzegovina, as a sovereign entity and as a successor state to the Socialist Federal Republic of Yugoslavia, Republic of Croatia, Former Yugoslavia Republic of Macedonia, as a sovereign entity and as a successor state to the Socialist Federal Republic of Yugoslavia, Republic of Slovenia, as a sovereign entity and as a successor state to the Socialist Federal Republic of Yugoslavia, Defendants–Appellees.**

**Federal Republic of Yugoslavia, Cross–Claim Plaintiff,**

v.

**Republic of Bosnia–Herzegovina, as a sovereign entity and as a successor state to the Socialist Federal Republic of Yugoslavia, Republic of Croatia, Former Yugoslavia Republic of Macedonia, as a sovereign entity and as a successor state to the Socialist Federal Republic of Yugoslavia, Republic of Slovenia, as a sovereign entity and as a successor state to the Socialist Federal Republic of Yugoslavia, Cross–Claim Defendants.**

**Docket No. 99–9011**

United States Court of Appeals, Second Circuit.

Argued May 4, 2000

Decided July 12, 2000

Philip Allen Lacovara, New York, New York (Mayer Brown & Platt, Robert J. Ward, Norman R. Williams II, of counsel), for Plaintiffs–Appellants.

George Miron, Washington, D.C. (Feith & Zell, P.C., Douglas J. Feith, Felicia Watson, of counsel), for Defendant–Appellee Republic of Bosnia and Herzegovina.

Radovan I. Pavelić, New York, New York (Pavelić & Levites, P.C., of counsel), for Defendant–Appellee Republic of Croatia.

Steven M. Schneebaum, Washington, D.C. (Patton Boggs LLP, of counsel), for Defendant–Appellee Republic of Macedonia.

Jonathan I. Blackman, New York, New York (Cleary, Gottlieb, Steen & Hamilton, Boaz S. Morag, Joseph T. Dixon, of counsel), for Defendant–Appellee Republic of Slovenia.

Wendy H. Schwartz, New York, New York (United States Attorney's Office for the Southern District of New York, Mary Jo White, Gideon A. Schor, of counsel), for Amicus Curiae United States of America.

Before: FEINBERG, PARKER, STRAUB, Circuit Judges.

FEINBERG, Circuit Judge:

On its face, this case concerns nothing more than a garden-variety landlord-tenant dispute. Plaintiffs (the landlords) are seeking to recover unpaid rent for offices leased to the former Socialist Federal Republic of Yugoslavia (SFRY) for use as consular offices in New York. Unfortunately for the landlords, the SFRY has ceased to exist. Beginning in 1991, the SFRY faced political upheaval and military conflict that eventually led to its disintegration. As a result, the SFRY has been replaced by five successor states: Slovenia, Croatia, Bosnia–Herzegovina, Macedonia, and the Federal Republic of Yugoslavia which is composed of Serbia and Montenegro (FRY). (Successors or successor states). A by-product of this conflict has been a number of civil suits in this country involving the SFRY, its agencies and state-owned companies, and the successor states, regarding their assets and liabilities in the United States.[1]

The landlords are suing the former SFRY and the five successor states. The landlords appeal from a judgment of the United States District Court for the Southern District of New York, Constance B. Motley, J., holding that the issues of whether any or all of defendant states succeed to the liabilities of the SFRY, and, if so, in what proportion, raise political questions that a federal court is not competent to decide. Instead of simply dismissing, however, the court issued an indefinite stay of the action. For the reasons set forth below, we affirm the district

---

**1.** See, e.g., *Interpamil GMBH v. Collectibles, Inc.*, No. 97 CIV. 9076, 1999 WL 1043960 (S.D.N.Y. Nov.16, 1999); *Sage Realty Corp. v. Jugobanka D.D.*, No. 95 CIV. 0323, 1998 WL 702272 (S.D.N.Y. Oct.8, 1998); *Beogradska Banka A.D. Belgrade v. Interenergo, Inc.*, No. 97 CIV. 2065, 1998 WL 661481 (S.D.N.Y. Sept.24, 1998); *Jugobank A.D. Belgrade v. Sidex Int'l Furniture Corp.*, 2 F.Supp.2d 407 (S.D.N.Y.1998); *Yucyco Ltd. v. Republic of Slovenia*, 984 F.Supp. 209 (S.D.N.Y.1997); *Federal Republic of Yugoslavia v. Park–71st Corp.*, 913 F.Supp. 191 (S.D.N.Y.1995).

court's decision as to justiciability, vacate the stay order and remand to the district court with instructions to enter a judgment for defendants and dismiss the complaint.

## I. Background

### A. Dissolution of the SFRY and Emergence of Successor States

Much has been written about the sad events in the Balkans in the last decade leading to the breakup of the former SFRY and the emergence of the successor states. For the purposes of this appeal, we see no need to add to the volumes of print on the subject except to cite those facts pertinent to the appeal.

Slovenia and Croatia formally declared independence in June 1991. Macedonia issued a declaration of independence in September 1991 and adopted a constitution in November 1991. Bosnia–Herzegovina declared its independence in March 1992. The United States recognized Slovenia, Croatia and Bosnia–Herzegovina in April 1992. In the following month, the three republics were admitted to the United Nations.[2] Susan L. Woodward, Balkan Tragedy 403–04 (1995). On April 27, 1992, the republics of Serbia and Montenegro declared themselves, under the name of FRY, the continuation and sole successors of the former SFRY. Neither the United States nor the European Community recognized the FRY. Richard Holbrooke, To End A War 5 n.θ (1998).[3] The Arbitration Commission, an arm of the International Conference on Former Yugoslavia which coordinated peacemaking efforts during the conflict, issued a number of opinions relevant to the succession of the successor states from the SFRY. Among its recommendations, the Commission noted that aspects of succession involving "state proper-

ty, archives and debts" are issues that must be resolved "by negotiation and agreement" among the successor states.

On May 24, 1992, the United States formally acknowledged that the SFRY had ceased to exist. In addition, SFRY's assets in this country have been blocked by executive orders dated May 30, 1992 and June 5, 1992 and related Treasury Department Regulations. See Exec. Order No. 12,808, 57 Fed.Reg. 23,299 (1992); Exec. Order No. 12,810, 57 Fed.Reg. 24,347 (1992).

The wars between the FRY and the other successor states, most notably Bosnia–Herzegovina, raged from the end of 1991 until 1995. In late 1995, following intense negotiations mediated primarily by the United States, the FRY and the successor states signed the Dayton Accords marking the end of the armed conflict in Bosnia. Simultaneously, a Peace Implementation Council was established in order to arrive at a comprehensive resolution of succession issues among the successor states. The United States and the successors claim that negotiations on these subjects have been sporadic but are still continuing.

### B. The Leases

The SFRY had entered into three leases with the landlords in early 1981. The offices were leased for use by three SFRY government agencies: the Consulate General of the SFRY (Consulate), the Yugoslav Press and Cultural Center (Cultural Center), and the Yugoslav Chamber of Economy (Chamber of Economy). All three leases expired in August 1991. On August 5, 1991, the Chamber of Economy's lease was extended to August 31, 1996; on October 21, 1991, the Cultural Center's lease was extended to September 30, 1994;

---

**2.** Macedonia was not admitted to the United Nations until April 1993. Woodward at 412. Recognition of Macedonia by most EU states did not come until December 1993, and the United States recognized Macedonia in February 1994.

**3.** See also Security Council Resolution 777, September 19, 1992, recommending that the FRY cannot automatically continue the membership of the former SFRY and must apply for membership. Woodward at 407.

and, on October 28, 1991, the Consulate's lease was extended to August 31, 1996. See *767 Third Ave. Assocs. v. Consulate General of the SFRY*, 60 F.Supp.2d 267, 269 (S.D.N.Y.1999).

As a result of the disintegration of the SFRY in 1991 and in opposition to Serbia's conduct, the United States Department of Treasury ordered the SFRY to close its consular offices and terminate all operations by May 31, 1992. The State Department also ordered all SFRY personnel to leave the United States by June 7, 1992. The landlords now allege that the SFRY breached the lease extensions by failing to pay the rent owed under the leases. The landlords claim that the total rent owed is $2,262,224 plus interest. *Id.* at 269–70.

## C. Procedural History

In June 1992, shortly after they were notified of the tenants' breach, the landlords filed a civil suit against the United States in the United States Court of Federal Claims, alleging that the closing of SFRY's consular offices "constituted a regulatory taking of its property, consisting of the benefits of its leases, for which it was entitled to just compensation under the Fifth Amendment." *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1578 (Fed.Cir.1995). The trial court granted the United States' motion for summary judgment, holding that plaintiffs "had no compensable investment-backed expectation 'to be free from government interference with [their] contract rights.' " *Id.* (quoting 30 Fed. Cl. 216, 222 (1993)). The Court of Appeals for the Federal Circuit affirmed.

In July 1992, while the landlords' action in the Court of Federal Claims was pending, they filed another action in the Southern District against the Consulate, the Cultural Center, and the Chamber of Economy. *767 Third Ave. Assocs. v. Consulate Gen. of the Socialist Federal Republic of Yugoslavia*, No. 92 Civ. 4946 (S.D.N.Y.1992). In December 1992, a default judgment against the Chamber of

Economy was entered in the amount of $8,483.63 with interest. The Chamber of Economy has not yet paid the judgement. The case against the Consulate and the Cultural Center was settled in December 1992. While the Cultural Center made its payment under the settlement, the Consulate has not yet made its payment. See *767 Third Ave.*, 60 F.Supp.2d at 270.

In February 1996, the landlords filed the present action for the entire amount of rent owed under the 1991 lease extensions, naming as defendants the SFRY and the five successor states (FRY, Slovenia, Croatia, Macedonia, and Bosnia–Herzegovina). The FRY also filed a cross-claim against the other successor states. As the district court noted, the five successor states all filed "essentially similar, but somewhat divergent, dispositive motions." *Id.* The common thread in all of the motions was the argument that their liability could not be determined without first answering nonjusticiable political questions.

In addition, the United States submitted a statement of interest on behalf of the State Department asserting that

> [i]t is the fundamental position of the United States … that the … SFRY, has ceased to exist and that no state represents its continuation…. [E]ach of the states that is before your Honor today that has emerged on its territory … is a successor. Each has interests in the assets and liabilities of the former SFRY, but those interests have not yet been determined by the executive.

*Id.* at 271. The United States explained that the policy of the executive branch has been that allocation of these interests should be determined through international negotiations.

## D. The District Court Opinion

In an extensive and thorough opinion, the district court concluded that this case posed a question that is " 'beyond the competence and proper institutional role of the federal courts.' " *Id.* at 272 (quoting *Jugo-*

*bank*, 2 F.Supp.2d at 415). Judge Motley began her discussion by quoting the enumeration in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), of factors to be considered in deciding whether a court is faced with a political question.[4] The judge then noted that this court has held that state succession was "the classic sort of political question that courts cannot decide." *767 Third Ave.*, 60 F.Supp.2d at 272 (citing *Can v. United States*, 14 F.3d 160, 163 (2d Cir.1994)). Thus, the judge reasoned,

> In each of the SFRY asset/liability cases, a critical factor in the court's political question analysis has been whether resolution of the case necessarily required judicial resolution of politically disputed successorship questions. Courts have been willing to adjudicate SFRY cases that could progress without adjudication of such questions.

*Id.*(comparing district court cases). The judge further found that even if successorship of the five states to the SFRY's liabilities was established, "allocation of SFRY assets and liabilities among multiple successors remains entirely unclear." *Id.* at 273. The court also noted that controversy among the states concerning the effective date of their successorship and whether they in fact enjoyed access to SFRY's consular facilities at the time of the lease extensions were political questions that the district court was not competent to decide. *Id.*

The district court's decision that this case is nonjusticiable rested primarily on the lack of judicially recognizable standards. However, the court also relied on other prongs of the political question doctrine. The judge stated that allocating liability among the successor states could trespass on the executive branch's authority in foreign policy, and thereby raise separation of powers concerns. *Id.* at 275. Additionally, the judge recognized the need for uniform judicial pronouncements on this subject. Mindful that other district courts in this circuit have concluded that this type of case presents nonjusticiable political questions, a contrary finding could create the " 'potentiality of embarrassment from multifarious pronouncements by various departments on one question.' " *Id.* (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. 691).

The court then considered the landlords' two proposed methods of allocating the alleged SFRY liabilities among the various defendants: (1) impose the same allocation of SFRY assets and liabilities used by the International Monetary Fund (IMF); or (2) apply a rule of joint and several liability. The district court rejected both suggestions. First, the judge noted that IMF allocation was inappropriate as it related only to state debt to the IMF, and the United States has "expressly reject[ed] use of the IMF percentages outside the IMF context." *Id.* at 276. Next, the court rejected joint and several liability on the ground that "it would not avoid any political questions, but simply would decide them implicitly and in a chaotic fashion." *Id.* The court pointed out that imposing joint and several liability would not only potentially lead to inequitable distribution of the debt, but would likely conflict with future political settlement of the debt allocation. *Id.* at 276–77.

---

4. In *Baker,* the Court stated that:

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. 691.

Finally, the district court considered whether it should dismiss the case or issue an indefinite stay. The court began by noting that:

> the political question doctrine in the national succession context is a rule that the judiciary should defer to a superior forum for the necessary foreign affairs determinations by giving that forum a reasonable opportunity to determine the political questions before the courts do. That superior forum may be national, such as an executive branch declaration of national foreign policy, or international, such as an international dispute resolution process.... Once the appropriate forum determines the political questions of succession, a court no longer should refuse to exercise its jurisdiction over the case.

*Id.* at 277. The court then considered the possibility that—even in the absence of a decision by the executive or by an international forum—it could adjudicate landlords' claims as "further delay of a plaintiff's ability to access the courts becomes inappropriate, extending past the rationale of deference to a superior forum." *Id.* The court concluded that in light of the lengthy succession process, the still-turbulent climate of the region, and the existence of international political efforts to resolve these issues, abstention at the present time was warranted. *Id.* at 278. It then stayed "all matters in the case" and placed the action on its suspense calendar. *Id.* at 282.

This appeal followed.[5]

## II. Discussion

### A. Appellate Jurisdiction

■ Most of the successor states argue that we lack jurisdiction over the appeal, under 28 U.S.C. § 1291, because the district court has not as yet entered a final judgment, but has instead stayed the case and abstained indefinitely. However, the Supreme Court has ruled that an "absten-

tion-based stay order was appealable as a 'final decision' under § 1291 because it put the litigants effectively out of court, and because its effect was precisely to surrender jurisdiction of a federal suit" to another forum. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 713, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (internal quotations and citations omitted). *Quackenbush* concerned abstention by a federal court in favor of resolution of the dispute in state court. In determining appealability, the effect of the district court's order here—abstaining in favor of resolution of the dispute through international negotiations or determination by the executive branch—is in all relevant respects indistinguishable from the situation in *Quackenbush*. The order effectively puts the litigants out of court based on a decision that at present the "federal court should decline to exercise its jurisdiction." *Id.* at 714, 116 S.Ct. 1712. Further, the district court's stay order was based on a determination that this case would require resolution of nonjusticiable political questions. This holding "conclusively determines an issue that is separate from the merits," and is therefore also appealable under the collateral order doctrine. *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 9, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Accordingly, we conclude that we have jurisdiction over this appeal.

### B. Justiciability

■ We turn now to the primary question raised by this appeal: whether the landlords' claims and the relief they seek "are of the type which admit of judicial resolution." *Powell v. McCormack*, 395 U.S. 486, 517, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). The landlords ask this court to determine (1) that the successors are liable for debt incurred by the SFRY; and (2) the proper allocation of that debt among the successors. The landlords argue that this determination does not require the

---

**5.** The FRY does not appeal from the district court's ruling staying its cross-claim.

resolution of political questions because there is no textual commitment of these issues to other branches of the government, the Executive has recognized the successors, application of New York State principles of joint-and-several liability provide a judicially manageable standard for fashioning relief, and "even applying international law" leads "automatically" to the same result.

We agree with the district court that virtually all of the *Baker v. Carr* factors, see supra n. 4, apply to this case. In *Baker,* the Court specifically addressed application of the political question doctrine to questions involving foreign relations. The Court noted that "[n]ot only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views." 369 U.S. at 211, 82 S.Ct. 691 (citations omitted).

■ Because the "nonjusticiability of political questions is primarily a function of the constitutional separation of powers ... the dominant consideration in any political question inquiry is whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Lamont v. Woods,* 948 F.2d 825, 831 (2d Cir.1991) (internal quotations and citations omitted); see also *Powell,* 395 U.S. at 518, 89 S.Ct. 1944. In *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918), the Supreme Court held that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."

In *Can v. United States,* 14 F.3d 160 (2d Cir.1994), this court considered a claim by a group of citizens of the Republic of South Vietnam who sought to obtain title to assets of the former Republic of South Vietnam in the United States. We held that "[t]he recognition of any rights of succession to a foreign sovereign's power *or property* is in the first instance constitutionally committed to the executive branch...." *Id.* at 163 (emphasis supplied). We conclude that these precedents squarely apply here.

In its amicus brief to us, the government argues that "liability, if any exists, cannot attach to the Successor Defendants in the absence of a political determination, which has not yet been made...." It further represents to us that "[t]he policy of the United States has been to encourage successors to agree among themselves regarding [debt] allocation," and that "the United States continues to support the international process as the means to pursue resolution." Thus, the executive branch has apparently made the initial policy determination that resolution of issues such as debt allocation among the successors to the SFRY must be resolved in an international forum. This position is understandable in light of the still volatile atmosphere in the Balkans. A determination by this court of the allocation of debt among the successors might hinder or prejudice the future resolution of this issue through negotiations or another determination by the Executive. Such an outcome would directly "interfere with executive foreign policy prerogatives," *Can,* 14 F.3d at 163.

The landlords argue that *Can* is distinguishable. They point out that in *Can* the United States had not recognized any government as the legitimate representative of the Republic of Vietnam, the state there involved, but in this case the President has actually recognized Slovenia, Macedonia, Bosnia, and Croatia as successors to the SFRY. The distinction is not dispositive. The plaintiffs in *Can* did not ask the court to recognize their sovereignty; they simply asked for recognition of their rights in certain property of the Republic of Vietnam. We stressed in *Can* that such a

determination might "prejudice other claimants" and could conflict with a future determination by the President. *Id.* The same concerns arise here where the landlords ask us to find that at least some of the successors have rights and obligations with respect to SFRY's property and the extent of those rights and obligations. This is precisely the type of determination that is reserved to the Executive in the first instance, and which has yet to be made.

The district court relied primarily on the second *Baker* factor ("a lack of judicially discoverable and manageable standards for resolving [the question]," 369 U.S. at 217, 82 S.Ct. 691) in support of its conclusion that this case does not lend itself to judicial resolution. As the Supreme Court noted in *Nixon v. United States,* 506 U.S. 224, 228–29, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993):

> the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch.

Applying this thinking to state succession, we concluded in *Can* that we "have *no standards* for judging a claim of succession to a former sovereign, even where that succession is only to property rather than to government power." 14 F.3d at 163 (emphasis supplied). We reasoned that questions of title were "inextricably intertwined with the question of state succession and sovereignty," which are reserved to determination by the executive branch. *Id.* at 165.

Moreover, with respect to the landlords' claim that joint and several liability principles provide a judicially manageable standard for fashioning relief, the district court

rejected that view and we agree. Such state law principles have no basis in international law, which is the body of law we must turn to in this case. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (international, not state, law governs the allocation of liabilities among foreign states). Indeed, the landlords do not point to any case where a court applied such a rule to determine the liabilities of successor states based on the liabilities of a defunct predecessor state.

Finally, international law does not support the landlords' claim that the successor states are automatically liable to the landlords. The Restatement (Third) of Foreign Relations Law § 209(2) provides that: *"Subject to agreement* between predecessor and successor states, responsibility for the public debt [6] of the predecessor, and rights and obligations under its contracts, remain with the predecessor state...." Clearly, no agreement between the SFRY and the successors regarding assumption of SFRY's liabilities has been formulated yet. None of the exceptions listed in the Restatement to this general rule applies. Accordingly, there is no rule of law that automatically subrogates successor states to their predecessor's debt. See *Yucyco,* 984 F.Supp. at 217 ("[u]nder principles of international law, a successor state ... is not bound by its predecessor's agreements"). It may be, as the landlords claim, that principles of equity and international comity suggest some equitable assumption of a predecessor state debt. See, e.g., Restatement (Third) Foreign Relations Law § 209 cmt. f; D.P. O'Connell, International Law 442–43 (1965). However, the federal courts do not have the authority or the means to determine the equitable distribution of the public debt of a foreign state among several successor states. See *Yucyco,* 984

---

**6.** Public debt is defined as debt owed by "one state to another or to an international organization, as well as to ... private foreign individuals or corporations...." Restatement (Third) of Foreign Relations Law § 209, cmt. b.

F.Supp. at 219 (equitable allocation among five new republics would require the court to make policy determinations " 'of a kind clearly for nonjudicial discretion' ") (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. 691); cf. O'Connell at 446 (the rights of the predecessor state and the creditors against the successors remain "abstract" until "a basis of repartition is agreed upon").[7]

▇ We have considered all of the landlords' arguments properly before us and none justifies a reversal on the issue of justiciability. Nevertheless, on this aspect of this case, some further observations are appropriate. The landlords also claim in this court that various sections of the Foreign Sovereign Immunities Act §§ 1330, 1602–11 (FSIA)[8] somehow dispose of the difficulties posed by the political question doctrine in this case. Specifically, the landlords appear to argue that *because* the FSIA gives the district court *jurisdiction* over foreign states in certain circumstances, *it must therefore* decide the issues before it.

▇ This argument merits little consideration. First, the landlords apparently did not press this claim in the district court, which undoubtedly accounts for the court's failure to consider the effect of the FSIA in its thorough opinion.[9] Under our settled principles, we should not consider an argument raised for the first time on appeal unless it is necessary to avoid "manifest injustice." *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 527 (2d Cir.1990) (citations omitted); see also *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir.1999) (no need to consider an argument that is raised for the first time in the reply brief). We do not believe it necessary to depart from our ordinary procedures in this case.

▇ Moreover, even if we were disposed to consider landlords' belated FSIA arguments to us, it would not change the result. The landlords advance it to support their view that because of various substantive provisions of the FSIA, supra n. 8, the district court *had* to decide the issues before it; i.e., it could not invoke the political question doctrine. We disagree. The sections cited to us by the landlords grant jurisdiction to the district court over a suit against a foreign state that might otherwise be barred by the principle of sovereign immunity. These

---

7. The landlords rely on *Commonwealth of Virginia v. State of West Virginia*, 220 U.S. 1, 31 S.Ct. 330, 55 L.Ed. 353 (1911), for the proposition that courts are able to equitably allocate debt among sovereigns. In that case, however, the Court held that it could enforce an obligation assumed by West Virginia when it became a state to contribute an equitable proportion of the public debt of the state of Virginia. The successors here have no such agreement. Certainly, once the successors resolve these issues by treaty or another type of agreement, courts may interpret and enforce rights created by such an agreement. See, e.g., *Baker*, 369 U.S. at 212, 82 S.Ct. 691; Restatement (Third) of Foreign Relations Law § 209, note 6 ("apportionment [of successor liability] is sometimes so complex and controversial as to defy judicial creativity, but in several instances international agreements made such apportionments and courts have interpreted and enforced them").

8. In their principal brief on appeal, the landlords relied on the "commercial activity" exception to sovereign immunity. 28 U.S.C.

§ 1605(a)(2). In the reply brief and at oral argument, the landlords argued—for the first time on appeal—that 28 U.S.C. § 1605(a)(4) somehow "eliminates any concern regarding justiciability" because it concerns acquisition of "rights in property" by a foreign state through "succession or gift." As is clear both from the language of the statute and the legislative history, however, that section governs acquisition of property through bequests or gifts (as opposed to a commercial transaction), and in no way refers to state succession. See H.R.Rep. No. 94–1487, reprinted in 1976 U.S.C.C.A.N. 6618–19.

9. In the district court, the landlords invoked the FSIA, 28 U.S.C. § 1605(a)(1), in their complaint to allege jurisdiction. In their reply memorandum to Bosnia's and Macedonia's motions to dismiss, the landlords briefly mentioned § 1605(a)(4) in a footnote responding to Macedonia's assertion of sovereign immunity. The landlords do not appear to have otherwise relied on the FSIA in the district court.

sections have nothing to do with the justiciability of claims concerning the liabilities of successor states.[10] "The language and history of the FSIA clearly establish that the Act was *not intended to affect the substantive law determining the liability of a foreign state . . . ."* *First Nat'l City Bank,* 462 U.S. at 620, 103 S.Ct. 2591 (emphasis added). In *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), the Court held that the FSIA did not prevent the President from requiring claims against Iran to be settled by an International Claims Tribunal rather than by the federal courts. The Court noted that the FSIA was designed solely "to remove *one* particular barrier to suit, namely sovereign immunity."[11] *Id.* at 685, 101 S.Ct. 2972 (emphasis supplied). In this case, the barrier of nonjusticiability still exists, as the district court correctly concluded.

### C. Abstention

 As noted above, the district court concluded that this dispute is nonjusticiable, but nevertheless declined to dismiss the case. Instead, it stayed the proceedings indefinitely and placed the case on the suspense calendar. Its rationale was that:

> [d]eference is proper not only on principles of comity, but also on principles of judicial manageability, because the anticipated policy determinations [by the Executive or an international dispute resolution process] would facilitate apportionment of liabilities in any judgment for plaintiffs. . . . *Thus, while the rationale for deference justifies delaying adjudication for a reasonable time to allow the anticipated policy determina-*

*tions, it does not justify permanently denying adjudication.*

60 F.Supp.2d at 282 (emphasis supplied). The district court relied on the doctrine of *Burford* abstention, where a federal court abstains "on grounds of comity with the States where . . . federal review of the question . . . would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Id.* (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). The district court reasoned that its deference to resolution of this dispute by international negotiations or by the Executive was akin to the "principles of comity and federalism" that support a stay of a federal action until state proceedings have concluded. *Id.* at 280, 282. As the district court correctly noted, the Supreme Court has held that when federal courts apply such abstention principles they may enter a stay, but are usually not permitted to dismiss the action altogether if the action is for money damages. *Quackenbush,* 517 U.S. at 730, 116 S.Ct. 1712.

 Nevertheless, we believe that the district court's entry of a stay order was inappropriate.[12] First, it raises the obvious question of why, if no "anticipated policy determinations" occur within a "reasonable time," the court will then be any more capable of deciding the political questions raised in this case than it is now. More fundamentally, the court's analogy to the abstention doctrine to justify a stay order here was incorrect. In the usual case of abstention, there is no question that the controversy is capable of judicial resolution and that a federal court would normally be required to exercise its juris-

---

10. The landlords simply conflate the question of jurisdiction with that of justiciability. As the Court explained in *Baker,* 369 U.S. at 198, 82 S.Ct. 691, "[t]he distinction between the two grounds is significant."

11. We need not, and do not, reach the issue of sovereign immunity under the FSIA. Cf. *Can,* 14 F.3d at 162 & n. 1.

12. Indeed, all parties to the appeal agree—albeit for different reasons—that abstention was inappropriate. Whereas the landlords argue for reinstating the action, the successors and the government argue that it should be dismissed.

diction and to adjudicate the case. Instead, federal courts, "exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and for the smooth workings of the federal judiciary. This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers." *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (internal quotations and citations omitted).

 By contrast, the political question doctrine is a function of the constitutional framework of separation of powers. *Powell*, 395 U.S. at 512, 89 S.Ct. 1944; *Baker*, 369 U.S. at 210, 82 S.Ct. 691 ("it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question' "). Although prudential considerations may inform a court's justiciability analysis, the political question doctrine is essentially a constitutional limitation on the courts. Just as "Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions, or to entertain friendly suits," it may not require courts "to resolve 'political questions,' because suits of this character are inconsistent with the judicial function under Art. III." *Sierra Club v. Morton*, 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Thus, where adjudication would force the court to resolve "political questions," the proper course for the courts is to dismiss. *Baker*, 369 U.S. at 217, 82 S.Ct. 691 (suggesting that where one of the political question factors is inextricable from the case, dismissal is appropriate); *Powell*, 395 U.S. at 512, 89 S.Ct. 1944; *DaCosta v. Laird*, 471 F.2d 1146, 1154, 1157 (2d Cir.1973) (dismissal appropriate where no judicially discoverable standards); Moore, Federal Practice § 101.116; see also *Goldwater v.*

*Carter*, 444 U.S. 996, 1005, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (plurality) (directing district court to dismiss complaint because it presented nonjusticiable political question); *Yucyco*, 984 F.Supp. at 219; *Federal Republic of Yugoslavia*, 913 F.Supp. at 195. Accordingly, that is what should be done here.

### Conclusion

We affirm the district court's decision as to justiciability. However, we vacate the stay, remand to the district court, and direct it to dismiss the complaint.